**SEALED**

CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
OCT 31 2018
JULIA C. DUDLEY, CLERK
BY: /s/
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
for the
Western District of Virginia

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

BLACK AND SILVER LG CELL PHONE (EVIDENCE ITEM 38 IN AUGUSTA COUNTY SHERIFF'S OFFICE CASE 2018-0002708)

Case No. 5:18mj-00058

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
BLACK AND SILVER LG CELL PHONE (EVIDENCE ITEM 38 IN AUGUSTA COUNTY SHERIFF'S OFFICE CASE 2018-0002708). See Attachment A of attached Affidavit, incorporated herein by reference.

located in the _____Western_____ District of _____Virginia_____, there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B of attached Affidavit, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. Section 1962 | Racketeer Influenced and Corrupt Organizations Act |
| 18 U.S.C. Section 1959 | Violent Crimes in Aid of Racketeering |
| 18 U.S.C. Section 924(c) | Use of a Firearm in Furtherance of a Crime of Violence |

The application is based on these facts:

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

John T. Pittman, Special Agent (FBI)
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 10/31/18

_____
*Judge's signature*

City and state: Charlottesville, Virginia

Joel C. Hoppe, United States Magistrate Judge
*Printed name and title*



CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED

OCT 3 1 2018

JULIA C. DUDLEY, CLERK
BY: /s/
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR WESTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF A BLACK AND SILVER LG CELL PHONE (EVIDENCE ITEM 38 IN AUGUSTA COUNTY SHERIFF'S OFFICE CASE 2018-0002708), CURRENTLY LOCATED AT FBI, 2211 HYDRAULIC ROAD, SUITE 201, CHARLOTTESVILLE, VIRGINIA | Case No. 5:18-mj-00058 |

### AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, John T. Pittman, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been since April 1997. I am familiar with various investigative techniques, including surveillance, interviews, and the execution of search and arrest warrants. Throughout my FBI career, I have conducted investigations relating to criminal street gangs, violent crimes, firearms, controlled substances, and other areas of law enforcement.

3. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, Section 1962 (Racketeer Influenced and Corrupt Organizations Act); Title 18, United States Code, Section 1959 (Violent Crimes in Aid of Racketeering); and Title 18, United States Code, Section 924(c) (Use of a Firearm in Furtherance of a Crime of Violence) have been committed.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

5. The property to be searched is a black and silver LG cell phone (Evidence item 38 in Augusta County Sheriff's Office case 2018-0002708), hereinafter the "Device." The Device is currently located at FBI 2211 Hydraulic Road, Suite 201, Charlottesville, Virginia.

6. The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

Hells Angels Motorcycle Club (HAMC) Background

7. The Hells Angels Motorcycle Club, better known as the Hells Angels, is an international organization with approximately 470 charters and 5,000 members across the globe. There are approximately ninety-one charters in the United States. The New York City charter of the HAMC is one of eight charters based in New York.

8. In the United States, the Hells Angels are organized into two regions: the East Coast and the West Coast. These regions have their own officers as well, from President or Chairman through Sergeant at Arms, with similar responsibilities. There is a formalized process

2

for a new charter within the Hells Angels. A prospective charter must be nominated and approved at the National and State levels. The charter must receive permission from the hierarchy and the charter that has control of the prospective charter's area to officially open. To be an official charter, a club needs at least six (6) full patch members.

9. There is also a formalized process for membership throughout the Hells Angels. A person who is interested in joining the gang can initially become a "Hangaround," someone who is recognized as a potential member and as more than simply a "friend of the club." Hangarounds don vests with a patch signifying the local charter on the back-bottom of their colors. While full members and "prospects," discussed below, would have a patch that states "New York" in red lettering on a white background with red trim, the hang-around patch will have white lettering and a red background. Depending on the charter, hangarounds wear a patch on the front left of their colors denoting their charter. They have no "rights" with respect to Hells Angel's business.

10. The next step toward full membership is to become a "prospect." In the state of New York, a prospect wears a vest with a bottom rocker that states "New York." A bottom rocker is a patch on the bottom of the back of a motorcycle gang member's vest, commonly referred to as a "cut", designating where the member if from. A front patch would identify his status as a prospect and his charter. Prospects attend the weekly Hells Angels' meetings, referred to as "church. Prospects are forbidden from entering the room unless they are beckoned. They do not have a vote and are not privy to any club business. Prospects are generally expected to do whatever a member asks or directs. During church, they guard the clubhouse; on motorcycle trips, or "runs," they are expected to hold firearms; and at other times they are

3

generally expected to follow members' bidding in whatever they demand. Per the Hells Angels' By-laws, a person is required to prospect for (1) one year before seeking full membership status.

11. If a prospect successfully completes this probationary period, the charter can vote to make him a full member. If accepted for membership, the person can then wear a vest with all the patches—the "Hells Angels" top rocker on the back of the vest, the death's head patch in the middle, and the "New York" rocker on the bottom. A top rocker is a patch on the top of the back of a motorcycle gang member's vest designating which motorcycle club the member belongs to. There is also an "MC" patch located on the back right of the colors – signifying motorcycle club. For this reason, actual Hells Angels are often referred to as "full patch" members. The member can also wear clothing, jewelry, indicia, and tattoos that explicitly use the Hells Angels name and the death's head logo.

12. The New York City charter officially opened on December 5, 1969. As of September 10, 2018, the New York City's HAMC leadership has been identified as follows: Frank Tatulli, President; Richard West, Vice President; Carlos E. Santiago; Treasurer, Daniel Deforest, Sergeant at Arms; and Rick Rotelli, Secretary.

Ongoing conflict between the HAMC and the Pagans Motorcycle Club (PMC)

13. Since the mid-1980s, the Hells Angels and Pagan's Outlaw Motorcycle Gangs have been entrenched in a violent turf war along the east coast. Due to rapid expansion by the Hells Angels into Pagan's self-perceived territory, on February 23, 2002, 74 Pagan's and an unknown number of Hells Angels clashed during the annual Hellraiser's Ball at the Vanderbilt Expo Center in Long Island, New York. Pagan's member Robert "Mailman" Rutherford, was fatally shot and killed by Hells Angels member Raymond Dwyer during the melee. Seventy-

4

three Pagan's were convicted of Title 18, United States Code, Section 1959 (Violent Crimes in Aid of Racketeering); Raymond Dwyer pled guilty to third-degree weapons possession in connection with a fracas. To date, the adversaries continue to utilize violence, such as murder, manslaughter, stabbings, drive-by shootings and assault to protect their self-perceived territory or state.

Incident at the Hometown Inn

14. At approximately 2:53am on September 9, 2018, the Augusta County Sheriff's Office received a 911 call about a shooting which had occurred at the Hometown Inn, 3554 Lee Jackson Highway, Staunton, Virginia. Responding officers identified two victims at the scene. One victim (Victim 1) had been beaten and one (Victim 2) had been shot.

15. Video footage from the Hometown Inn's security system was reviewed. The review revealed that five individuals ambushed the two victims after the victims had checked into the hotel and were approaching, on their motorcycles, the parking area in front of their room.

> a. Victim 1 was rushed by one of the five individuals and pushed off his motorcycle onto the ground. The individual who pushed Victim 1 off the motorcycle was joined by another of the five individuals; both repeatedly struck Victim 1. It appeared each of the individuals was striking Victim 1 with some type of object.
>
> b. Victim 2 was rushed by three of the five individuals and, as Victim 2 tried to turn his motorcycle to get away, the motorcycle fell to the ground. Shortly thereafter one of the three individuals (Shooter 1) shot, using his right hand, at Victim 2.

5

Victim 2 began to run and was pursued by the three individuals. A second individual (Shooter 2) shot twice, possibly three times, using his left hand, at Victim 2. Victim 2 continued to run and Shooter 1 shot a second time and Victim 2 fell to the ground.

16. Investigation determined that the five individuals who ambushed the victims were part of a seven person group – six members and one prospect – of the New York City Chapter of the HAMC. The individuals have been identified as follows:

   a. Richard E. West – Based on review of video footage, it appears West was one of the three individuals who chased Victim 2.

   b. Dominick J. Eadicicco - Based on review of video footage, it appears Eadicicco is Shooter 2.

   c. Anthony Vincent Milan – Based on review of video footage, it appears Milan is Shooter 1.

   d. Joseph Anthony Paturzo – Based on review of video footage, it appears Paturzo is the individual who knocked Victim 1 from his motorcycle and repeatedly struck Victim 1.

   e. Nathaniel A. Villaman - Based on review of video footage, it appears Villaman is the second individual who repeatedly struck Victim 1.

   f. Domingo Buster – Buster did not appear on the video during the time of the ambush.

   g. Andy Thongthawath – Thongthawath did not appear on the video during the time ambush.

17. Review of video footage from the Pilot Travel Center (Pilot), which is located across Lee Jackson Highway from the Hometown Inn was reviewed. The victims pulled into Pilot at approximately 12:50am on 09/10/2018 and parked their motorcycles next to the gas pumps. A few minutes later they entered the Pilot building. At approximately 1:04am the victims walked through the doorway leading to the laundry area of Pilot. At approximately 1:35am

6

Paturzo and Eadicicco are seen walking toward the Pilot from the direction of the Hometown Inn. As they walked past the gas pumps they notice the victims' motorcycles. After Paturzo and Eadicicco enter the Pilot building they appear to be looking up and down the aisles. Eadicicco looked to the right of the ATM machine (which would be in the direction of the laundry area). The victims did not exit the laundry area until after 2:00am. After looking in this direction Eadicicco ran in the direction of where Paturzo was standing and they both exited the Pilot. Paturzo and Eadicicco walked in the direction of the Hometown Inn. (Review of Hometown Inn video shows Paturzo and Eadicicco both leaving and returning to the Hometown Inn at times consistent with the Pilot video.)

    a. When seen on the Pilot video, the victims are wearing their Pagan's "cuts".

    b. Paturzo and Eadicicco are wearing their Hells Angels "cuts" when seen on the Pilot video.

18. Review of video footage from the Hometown Inn revealed that after Paturzo and Eadicicco returned from the Pilot, West, Milan and Villaman come out of their rooms. They all, at various times, look in the direction of the Pilot. At times, binoculars were used to look in the direction of the Pilot. Also, West appeared to be filming with a tablet device in the direction of Pilot. This surveillance of Pilot occurred from the time Paturzo and Eadicicco returned from Pilot until the ambush.

19. Based on my training and experience, individuals involved in criminal enterprises will utilize cell phones as a method of maintaining contact with their co-conspirators. They will use cell phones to send and receive text messages, e-mails, photographs, videos and other digital

7

and electronic data that pertains to their activities. I know that cell phones store data for long periods of time and through the use of forensic tools may recover deleted data from them.

20. The Device is currently in the lawful possession of the FBI. It came into the FBI's possession in the following way: The Device was one of three cell phones seized when the seven HAMC individuals were arrested at the Hometown Inn. The three cell phones were subsequently turned over to the FBI.

21. The Device is currently in storage at FBI, 2211 Hydraulic Road, Suite 201, Charlottesville, Virginia.

## TECHNICAL TERMS

22. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still

8

photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to

9

store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This

10

removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g. Pager: A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network. Some pagers enable the user to send, as well as receive, text messages.

h. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed

11

properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

   i. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

23. Based on my training, experience, and research, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS personal digital assistant and access the internet. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

24. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

25. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct

12

evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

    a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

13

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

26. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

27. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

28. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

John T. Pittman
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
On October 31, 2018:

Joel C. Hoppe
United States Magistrate Judge

15

## ATTACHMENT A

The property to be searched is a black and silver LG cell phone (Evidence item 38 in Augusta County Sheriff's Office case 2018-0002708), hereinafter the "Device." The Device is currently located at FBI 2211 Hydraulic Road, Suite 201, Charlottesville, Virginia.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

5:18-mj-00058

## ATTACHMENT B

1. All records on the Device described in Attachment A that relate to violations of Title 18, United States Code, Section 1962 (Racketeer Influenced and Corrupt Organizations Act); Title 18, United States Code, Section 1959 (Violent Crimes in Aid of Racketeering); and Title 18, United States Code, Section 924(c) (Use of a firearm in Furtherance of a Crime of Violence) have been committed, including:

   a. Evidence relating to the structure, membership, scope, and operations of the criminal enterprise or the structure, membership, scope, and operations of a rival or competing motorcycle gang.

   b. Evidence related to the membership, association or affiliation with a RICO or VICAR enterprise including any and all activity associated with such enterprise.

   c. Communications, photographs and videos regarding threats, intimidation, tampering and violence with/against rival or competing motorcycle gangs.

   d. Evidence indicating how and when the Device was accessed or used, to determine the chronological and geographic context of access, use, and events relating to crimes under investigation and to the Device user.

   e. Evidence indicating the Device user's state of mind as it relates to the crimes under investigation.

   f. The identity of the person(s) who used or owned the Device, including records that help reveal the whereabouts of such person(s).

g. The identity of the person(s) who communicated with the device user about matters relating to violations of Title 18, United States Code, Section 1962 (Racketeering Influenced and Corrupt Organizations Act); Title 18, united States Code, Section 1959 (Violent Crimes in Aid of Racketeering); and Title 18, United States Code, Section 924(c) (Use of a Firearm in Furtherance of a Crime of Violence), including records that help reveal their whereabouts.